IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JESSICA MYERS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02186-DAC<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

Plaintiff Jessica Myers challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI).[1] (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Oct. 14, 2025). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #4). For the reasons below, I **AFFIRM** the Commissioner's decision denying DIB and SSI.

## PROCEDURAL BACKGROUND

Ms. Myers applied for DIB and SSI on July 21 and August 18, 2023, respectively, alleging she became disabled on April 1, 2020. (Tr. 261, 263). After the claims were denied initially and on

[1] In her brief, Ms. Myers argues only her claim for SSI and "does not make any specific arguments herein regarding her application for" DIB. (ECF #9 at PageID 1749, n.1). Based on this representation, I discuss her DIB claim as it is relevant to her SSI claim.

reconsideration, Ms. Myers requested a hearing before an Administrative Law Judge. (Tr. 165, 171, 180, 185, 189). In October 2024, Ms. Myers (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 82-111). On November 1, 2024, the ALJ determined Ms. Myers was not disabled. (Tr. 56-77). On August 14, 2025, the Appeals Council denied her request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. §§ 404.981, 416.1481). Ms. Myers timely filed this action. (ECF #1).

## FACTUAL BACKGROUND

### I. Personal and Vocational Evidence

Ms. Myers was 41 years old on her alleged onset date and 46 years old at the administrative hearing. (*See* Tr. 114). She has a GED and attended some college and she has worked as a fast-food worker. (Tr. 90-91, 104).

### II. Medical Evidence[2]

#### A. Records submitted before the administrative hearing

In February 2021, Ms. Myers presented to the emergency department with left knee pain and swelling and reported a history of rheumatoid arthritis in her knees. (Tr. 785). On examination, she had swelling, tenderness, a reduced range of motion, and difficulty walking. (Tr. 785-86). She was discharged with prescriptions for pain medications and steroids and told to follow up with her primary care provider. (Tr. 787).

[2] For Ms. Myers DIB claim, she had to establish disability prior to the expiration of her insurance against disability on December 31, 2021. *See* 20 C.F.R. § 404.131(b). For her SSI claim, she must establish disability after the application date of July 21, 2023. *See* 20 C.F.R. § 416.200. I thus discuss the record from before July 2023 solely for providing the necessary background.

In April 2022, Ms. Myers' rheumatologist evaluated her for post-COVID arthralgia. (Tr. 889). She reported being diagnosed in 2002 with rheumatoid arthritis but never started medications. (*Id.*). She complained of left knee, hip and lower-back pain. (*Id.*). A physical examination noted an abnormal gait from pain, pain when maneuvering the left knee, inability to maneuver the left hip, and tenderness to palpitation over the left hip and sacroiliac joint; also, Ms. Myers stood up during the visit due to pain while sitting. (Tr. 891). Ms. Myers was prescribed prednisone. (Tr. 893). She requested a walker because she was using an office chair to be active around the house due to pain and discomfort from her arthritis. (Tr. 888). X-rays taken in April revealed a normal appearance of her sacroiliac joints, mild degenerative disc changes in her lumbar spine, and both knee joints generally preserved. (Tr. 878-79).

Ms. Myers followed up with her rheumatologist in May and reported feeling better with a walker and starting prednisone. (Tr. 880). Later in May, she reported 10% improvement from prednisone, including the ability to sit for "maybe an hour" before feeling stiff. (Tr. 873). A physical examination found reduced strength in the left thigh, tenderness to palpation over the left hip and sacroiliac joints, an abnormal gait due to pain, inability to fully bend forward, and that she tried to avoid moving her left hip as she bent down. (Tr. 876). Her prednisone dosage was increased. (Tr. 879). Later that month, she reported that the increased dose of prednisone did not provide relief. (Tr. 866).

A June 2022 MRI of Ms. Myers' sacroiliac joints noted a subchondral marrow edema within the sacrum of both sacroiliac joints but no erosive changes, joint effusion, or capsulitis. (Tr. 1099-1100). In September, Ms. Myers sought treatment from an internist for gradually worsening weakness in her legs and numbness in her left leg after sitting. (Tr. 845). A physical

examination noted numbness in both legs, she was walking with a walker, and her gait was intact. (Tr. 848).

In December 2022, Ms. Myers sought pain-management care with Maria Grabnar, M.D., complaining of left leg pain and weakness that had worsened after a motor vehicle accident the previous summer. (Tr. 835). She was using "a rollator for pain." (*Id.*). She described her pain as sharp, beginning at the knee and radiating to her thigh, and worse when laying on her back, standing, and holding any position for too long. (*Id.*). A physical examination noted her gait was "normal-base," non-antalgic, and she used a rollator; full strength and range of motion in her left leg; a positive "log roll on the left"; and pain with resisted knee extension. (Tr. 836). She was diagnosed with quadriceps tendinitis, left-hip osteoarthritis, and sacroiliitis. (Tr. 837).

In March 2023, Ms. Myers sought care for worsening hip and knee pain after she hyperextended her left hip and knee in several recent falls. (Tr. 831). A physical examination found tenderness in her left hip, an antalgic gait, and reduced range of motion. (Tr. 832). An x-ray of her left hip showed advanced left-hip osteoarthritis, mild over-coverage of the femoral head by the acetabular roof that may be associated with cam-type femoral acetabular impingement, no acute fracture or dislocation of the left hip, and lower lumbar hypertrophic facet arthrosis. (Tr. 1086). She was referred for consultation with an orthopedic specialist for "possible injection for pain" as she "has multiple osteophytes and a large amount of arthritis." (Tr. 832).

In April 2023, Ms. Myers consulted with orthopedic surgeon Alvaro Ibaseta, M.D.; at the time, she was ambulating with a walker and showing issues with weightbearing and moving. (Tr. 829). A physical examination noted no neurologic gait problems and no tenderness to palpation over her hip, but severe pain with log roll. (Tr. 830). X-ray imaging of her pelvis and

both hips showed moderate-to-severe bilateral hip osteoarthritis, left greater than right; bilateral pincer- and cam-type femoral acetabular impingement; no acute osseous abnormality; and progression since the March x-ray. (Tr. 1084-85). Dr. Ibaseta characterized these as demonstrating "severe" osteoarthritis. (Tr. 829). He recommended no weightbearing on the left lower extremity and ordered an MRI of Ms. Myers' left hip. (Tr. 830).

In May 2023, Ms. Myers followed up with Dr. Grabnar to manage her continued left hip and knee pain. (Tr. 826-27). A physical examination noted a "normal base, non-antalgic" and "[g]rossly normal" gait and that Ms. Myers did not use an assistive device. (Tr. 827). Ms. Myers had not begun physical therapy; Dr. Grabnar encouraged her to follow up after doing so. (Tr. 826, 828).

Ms. Myers began physical therapy in June. (Tr. 820). She was assessed with decreased muscle strength, decreased muscle extensibility, and an altered gait pattern. (Tr. 822). Though she was "independent with [a] rollator," her gait was antalgic and she had a decreased left stance time. (Tr. 821). She presented similarly in July at her second physical therapy appointment. (Tr. 815).

In October 2023, Ms. Myers was seen for flank pain that was diagnosed as an infection. (Tr. 1564). On examination, she was noted to have a normal gait. (Tr. 1565). In November 2023, she followed up with her primary care physician, complaining her left knee hurt and would give way while using her rollator walker. (Tr. 1555). She reported the pain persisted despite medication, ice, heat, lidocaine patches, and elevation. (*Id.*). A physical examination noted tenderness in the left knee, reduced range of motion, and intact gait. (Tr. 1559).

In January 2024, Ms. Myers sought care for knee and hip pain after she slipped on ice while she was getting into her car, causing her to fall on her left knee. (Tr. 1607). She reported her

chronic pain was progressively worse and she described episodes where it "feels like my hip is going to pop out" when she stood too quickly. (Tr. 1607-08). A physical examination found a tender and slightly swollen left knee, reduced range of motion in the left knee and hip, and an antalgic gait. (Tr. 1608-09). A hip x-ray showed severe left hip osteoarthritis (Tr. 1630). Ms. Myers was prescribed medication and instructed to follow up with her primary-care physician. (Tr. 1609). She did so in February and reported her knee had not improved and she was still unable to bend it. (Tr. 1603-04). A physical examination found back, left-knee, and neck pain as well as an intact gait. (Tr. 1605-06).

### B. Records submitted after the administrative hearing

In July 2024, Ms. Myers consulted with orthopedic specialist Jenson Kolaczko, M.D., to discuss a total hip replacement. (Tr. 25, 27). A physical examination of her left hip noted a limited range of motion and pain with flexion and rotation. (Tr. 27). Dr. Kolaczko reviewed x-ray imaging from January 2024 showing "osteoarthritis with complete loss of joint space and osteophyte formation" in Ms. Myers' left hip and "minimal changes" and "maintained joint" in her left knee. (*Id.*). He referred her to a colleague for a total hip replacement and for pain management for the "minimal arthritis" in her left knee. (*Id.*).

On September 3, 2024, Ms. Myers returned to her pain management physician, Dr. Grabnar, complaining of left thigh and knee pain and continued left hip pain that had worsened since the x-ray in January. (Tr. 22). A physical examination found a "normal base, non-antalgic gait" with "no use of an assistive device." (Tr. 23). Dr. Grabnar recommended a repeat x-ray of the left hip, noted her upcoming evaluation for a left hip replacement, and recommended a left-hip injection after noting the lack of other prior treatments for pain. (Tr. 22, 24).

On September 10, 2024, Ms. Myers consulted with orthopedic surgeon Ari Levine, M.D., about her left hip pain. (Tr. 19). A physical examination noted a reduced range of motion, full strength, and increased pain with proactive maneuvers. (Tr. 20). Dr. Levine reviewed the January 2024 x-ray showing end stage left hip osteoarthritis with loss of joint space and marginal osteophyte formation. (*Id.*). Ms. Myers decided to proceed with a total hip replacement. (Tr. 20). That same day, Ms. Myers underwent the updated x-ray of her left hip and pelvis recommended a week prior, which found mild bilateral osteoarthritis of the hips, left greater than right; a cam-type deformity of the right hip; and pincer-type femoral acetabular impingement of the left hip. (Tr. 17-18; *see also* Tr. 22, 24).

## III. Opinion Evidence

In September 2023, state agency medical consultant Bradley Lewis, M.D., reviewed Ms. Myers' medical records and opined she can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for about 6 hours each in an 8-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently stoop and kneel; occasionally crouch; and frequently crawl. (Tr. 119, 128).

On reconsideration review in February 2024, state agency medical consultant William Staehle, M.D., reviewed updated medical records and concluded Ms. Myers' condition worsened since the expiration of her disability insurance on December 31, 2021. (Tr. 140, 152). Dr. Staehle thus issued two opinions: one for the period up to December 31, 2021; the other covering the period after that date.

Dr. Staehle affirmed Dr. Lewis's findings up to December 31, 2021. (*See* Tr. 138-39, 150-51). After that date, Dr. Staehle opined Ms. Myers can lift and carry up to 20 pounds

occasionally and 10 pounds frequently; occasionally push and pull with her lower extremities; stand and walk for about 4 hours in an 8-hour work day; sit for about 6 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to extreme cold and wetness and avoid even moderate exposure to dangerous machinery and unprotected heights. (Tr. 141-42, 153-54).

## IV. Function Report and Testimonial Evidence

Within months of filing her application for benefits, Ms. Myers completed an Adult Function Report where she reported her hip and leg pain prevented her from standing for more than 10 minutes or sitting for more than 10-15 minutes. (Tr. 301). After that, she must lie down and straighten her hip and leg or else her hip will lock up and cause intense pain. (*Id.*). Additionally, her leg may give out at any minute, which prevents her from going out alone. (*Id.*, Tr. 305). Needing to be able to lay down and straighten her leg so frequently has caused her to "become a hermit." (Tr. 306). In a typical day, she needs help dressing and bathing in the morning, after which she attempts physical therapy exercises and may walk outside with her walker for a few minutes. (Tr. 303). She can perform household chores so long as she can be sitting in her walker. (Tr. 304). She reported her doctor prescribed a brace in March 2021, a walker in October 2022, and crutches on March 21, 2023. (Tr. 308).

At the administrative hearing in October 2024, Ms. Myers provided an up-to-date assessment of her conditions. She explained she applied for benefits because she cannot physically go out and do anything to make money. (Tr. 95). She cannot work because she is immobile without assistance and constant pain from her hip and pain from her knee prevents her from

standing or sitting for long periods of time. (*See id.*). The only way she can relieve her pain is by laying down with a special pillow between her legs, which she does constantly throughout the day. (Tr. 95, 98). She does not lie on her back because she cannot straighten her leg from that position. (Tr. 101). She is prescribed prednisone, but it does not help. (Tr. 98, 102). She must rest for about an hour before she can resume activity. (Tr. 99).

If she is "really pushing it," she can be on her feet for at most fifteen minutes. (Tr. 96). She can walk or sit for about 10 to 15 minutes. (*Id.*). After that, her hip and knee start to hurt as if electricity is running down her leg and her hip will pulse with pain. (*Id.*). She does not stand up straight and walks hunched over. (*Id.*). If she stands up too fast, she can fall. (*Id.*). She uses her walker to ambulate and still has her crutches, though her knee brace has worn out and her insurance refuses to pay for a new one. (Tr. 97). She bears all her weight on her right leg and always tries to keep her hands free to maintain balance. (Tr. 96). She can climb two or three stairs, one leg at a time. (Tr. 97). She cannot kneel, crawl, bend, or squat. (Tr. 98).

On a typical day, Ms. Myers can shower if she has help, and can make breakfast in the microwave or toaster, but she stays close to home where she can lay down. (Tr. 94). She resides with her youngest son who takes her to her many doctor's appointments. (Tr. 89, 94). She cannot drive because sitting in the driver's seat causes her hips to lock up and prevents her from stretching out her waist and leg. (Tr. 90). She can do household chores such as sweeping or mopping in 10-minute increments, but she must be able to sit on her walker throughout. (Tr. 95). She cannot go grocery shopping in the store unless she knows she can get in and out within 15 minutes to avoid pain. (Tr. 100). She could not complete an MRI in 2022 because she was in too much pain from

lying on her back on a hard surface. (Tr. 100-01). She no longer does physical therapy exercises to avoid overworking her hip joint. (Tr. 103).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this sequential analysis, the claimant has the burden of proof through Step Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform

other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. §§ 404.1520(c)-(f), 416.920(c)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Myers had not engaged in substantial gainful activity since April 1, 2020, the alleged onset date. (Tr. 58). At Step Two, the ALJ identified the following severe impairments: osteoarthrosis and allied disorders (osteoarthritis of the bilateral hips, enthesophytes of the bilateral knees), spine disorder (degenerative disc disease of the lumbar spine), obstructive sleep apnea, obesity, and migraine headaches. (*Id.*). At Step Three, the ALJ found Ms. Myers' impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 61-63). At Step Four, the ALJ determined Ms. Myers' RFC as follows:

> After careful consideration of the entire record, I find that from the alleged onset date of April 1, 2020 through the date last insured of December 31, 2021, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently stoop, kneel, and crawl; occasionally crouch.
>
> From the protective filing date of July 13, 2023 through the present, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except standing and/or walking for only 4 hours in an 8-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; occasionally work at unprotected heights; can tolerate no more than frequent exposure to humidity and wetness, and extreme cold.

(Tr. 63-64) (cleaned up). The ALJ found Ms. Myers could perform her past relevant work through her date last insured of December 31, 2021, but she could no longer perform her past relevant work as of her SSI application date of July 13, 2023. (Tr. 73, 75). At Step Five, the ALJ determined

Ms. Myers could perform other work, including as routing clerk, mail sorter, and merchandise marker. (Tr. 76). Thus, the ALJ concluded Ms. Myers was not disabled. (Tr. 77).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a

"zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Myers argues remand is warranted under (1) Sentence Six of 42 U.S.C. § 405(g) to consider new and material evidence unavailable at the administrative hearing, and (2) Sentence Four of 42 U.S.C. § 405(g) because the ALJ improperly evaluated whether Ms. Myers medically needed an assistive device for standing and walking. (ECF #9 at PageID 1749, 1758, 1760).

### I. Sentence Six remand

First, Ms. Myers argues that remand is appropriate under Sentence Six of § 405(g) to consider new and material evidence about her hip and knee pain covering July through September

2024 that was produced several months after the administrative hearing. (ECF #9 at PageID 1758-60). In particular, she relies on 37 pages of medical records documenting 7 treatment appointments, a panel of laboratory tests, and an x-ray imaging study over the period from April 3, 2024 through September 10, 2024. (Tr. 16-52). Several records detail treatment for unrelated conditions. (*See* Tr. 29-52). Ms. Myers points out the "updated diagnostic imaging as well as an evaluation by an orthopedic surgeon who opines that the nature and severity of Plaintiff's impairment warrant a total joint replacement" as justifying remand. (ECF #9 at PageID 1758-59) (citing Tr. 17-20). The Commissioner counters that this evidence was not material because it was cumulative to other evidence in the record and it covered the time after the administrative hearing. (ECF #10 at PageID 1776-77).

Sentence Six of § 405(g) authorizes remand of a disability case for further administrative proceedings to consider evidence presented after the ALJ's decision. *Lee v. Comm'r of Soc. Sec.*, 529 F.App'x 706, 717 (6th Cir. 2013). Sentence Six provides:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g). The Sixth Circuit has explained that a Sentence Six remand "for consideration of additional evidence is warranted only if the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). The Commissioner concedes the evidence is new and Ms. Myers had good cause for being unable to present the evidence to the ALJ, but argues the evidence is not material. (ECF #10 at PageID 1776).

Ms. Myers argues the evidence is material because "it is directly related to an issue before the ALJ." (ECF #9 at PageID 1758). This misstates the relevant standard. Under Sixth Circuit precedent, evidence is "material" for the purposes of a Sentence Six remand only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Ferguson*, 628 F.3d at 276.

The September 2024 x-ray of Ms. Myers' left hip and pelvis is not material. That study found *mild* bilateral osteoarthritis of the hips, left greater than right; a cam-type deformity of the right hip; and pincer-type femoral acetabular impingement of the left hip. (Tr. 17-18). But other x-ray imaging already in the administrative record found a more severe condition. X-rays performed in March and April 2023 both showed osteoarthritis in Ms. Myers' left hip at greater severity as well as cam- and pincer-type femoral acetabular impingement. (*See* Tr. 1084-86). Another x-ray in January 2024 showed *severe* left hip osteoarthritis. (Tr. 1630). Thus, the September 2024 x-ray imaging would have little impact because the March and April 2023 x-ray imaging each documented more severe osteoarthritis in Ms. Myers' hips. (*Contrast* Tr. 17-18 *with* Tr. 1084-86, 1630) ("mild" osteoarthritis in September 2024 while "advanced" and "moderate-to-severe" osteoarthritis in March and April 2023 and "severe" osteoarthritis in January 2024). Thus, this

new evidence does not suggest a reasonable probability of a different disposition of Ms. Myers' disability claim. *See Ferguson*, 628 F.3d at 276. At best, the September 2024 x-ray is cumulative to the March and April 2023 x-rays. At worst, the September 2024 x-ray supports the ALJ's no-disability finding by suggesting Ms. Myers' osteoarthritis had improved from advanced and moderate-to-severe in March and April 2023 to mild in September 2024.

Ms. Myers overreads the records documenting her pursuit of a total hip replacement. She contends they contain "an evaluation by an orthopedic surgeon who opines that the nature and severity of Plaintiff's impairments warrant a total joint replacement." (ECF #9 at PageID 1758-59) (citing Tr. 17-20). But no such opinion is in the records. In July 2024, Ms. Myers met with an orthopedic specialist to discuss a total hip replacement and was referred to Dr. Levine, an orthopedic surgeon, for the procedure. (Tr. 25, 27). The treatment note documenting Ms. Myers' meeting with Dr. Levine does not contain an opinion by Dr. Levine that Ms. Myers' impairments warrant a total joint replacement. Rather, the note recounted Dr. Levine "discussed the risks, benefits, and alternatives of this procedure" and "patient wishes to proceed." (Tr. 20) (cleaned up).

While one can presume a physician would not recommend an unwarranted procedure, the note does not represent an opinion by Dr. Levine that Ms. Myers' impairments warrant the procedure; instead it states Ms. Myers wanted to proceed. At most, the note describes Ms. Myers' condition as "[osteoarthritis] in the setting of failed conservative mgmt." (Tr. 20). But even that does not go so far as implying the only next course of treatment is a total hip replacement. Dr. Levine noted Ms. Myers's treatment history as "[s]he has had multiple NSAIDs without relief. No prior injections." (Tr. 19) (cleaned up). Similarly, Ms. Myers' pain-management physician, Dr. Grabnar, also noted Ms. Myers had "[n]o prior treatments for this pain, including injections" and

Dr. Grabnar recommended injections. (Tr. 22, 24). Because other alternative treatments were available, one cannot infer that a total hip replacement was warranted from the fact that Dr. Levine was willing to perform the procedure.

I thus decline to order remand under Sentence Six of 42 U.S.C. § 405(g).

**II. Sentence Four remand**

Second, Ms. Myers argues that remand is appropriate under Sentence Four of § 405(g) because substantial evidence did not support the ALJ's finding that Ms. Myers did not medically require an assistive device for walking and standing. (ECF #9 at PageID 1763, 1764-66). Sentence Four provides: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Sixth Circuit has explained that a Sentence Four remand is appropriate when the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Walters*, 127 F.3d at 528. Ms. Myers argues the RFC lacked the support of substantial evidence because the ALJ relied on the few examinations where Ms. Myers had a normal gait (one of which was via telehealth) and ignored other examinations that noted an antalgic gait, her use of a rollator, and weakness in her legs. (ECF #9 at PageID 1763, 1764-66). The Commissioner responds that Ms. Myers has not shown she medically required a rollator under the requirements of Social Security Ruling 96-9p. (ECF #10 at PageID 1777-79).

When medically required, a hand-held assistive device like a walker or a rollator must be included in the RFC. *Carreon v. Massanari*, 51 F.App'x 571, 575 (6th Cir. 2002). To be medically required, there must be "medical documentation establishing the need for a hand-held assistive

device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." *See* Soc. Sec. Ruling (SSR) 96-9p, 1996 WL 374185, at *7 (July 2, 1996). Ms. Myers does not point to any documentation establishing the need for a rollator or the circumstances for which she needs it.

Ms. Myers cites her doctors' treatment notes that she requested a walker in 2022 because she was using an office chair to be active around the house and that a walker helped her with movement. (ECF #9 at PageID 1764) (citing Tr. 888, 873). But a claimant's subjective desire to use a walker is not enough. *See Carreon*, 51 F.App'x at 575. Ms. Myers also cites numerous treatment notes documenting her use of a walker. (ECF #9 at PageID 1765) (citing Tr. 829-30, 814-16, 820-21, 831-32, 1677). But reporting use of a walker does not prove it was medically required per SSR 96-9p. *See Morrow v. Comm'r of Soc. Sec.*, No. 1:18-cv-403, 2019 WL 1428199, at *12 (N.D. Ohio Mar. 29, 2019) ("[T]he provider merely observed Morrow using a cane or walker, without imposing a requirement that he do so."). At most, the treatment notes Ms. Myers cites document her use of a walker, but none affirmatively state her rollator was medically required. (*See* Tr. 829 ("She is now ambulating with a walker and has issues with any weightbearing and movement"), 815 ("Gait: antalgic . . . independent with rollator"), 821 (same), 831-32 (no mention of walker or rollator), 1677 (same)).

Moreover, as the Commissioner points out, the notes from May 2022 and April 2023 fall outside the relevant period for disability because they are from after her December 31, 2021 date last insured (making them immaterial to her DIB claim), but before her July 21, 2023 application date (making them immaterial to her SSI claim). *See* 20 C.F.R. §§ 404.131(b), 416.200 (requiring a

DIB claimant to prove disability before the date last insured and an SSI claimant prove disability after the application date).

Looking at the record from after July 2023, the record is not consistent about Ms. Myers' use of a rollator. Several notes document an intact gait while omitting mention of an assistive device. (*See* Tr. 1565 (normal gait with no mention of a walker or rollator in October 2023), 1559 (same in November 2023), 1605-06 (same in February 2024)). Even then, the record between December 2021 and July 2023 is mixed: A May 2023 physical examination documents a "normal base, non-antalgic" and "[g]rossly normal" gait with no mention of an assistive device. (Tr. 827).

Similarly, Ms. Myers' citation of x-ray imaging of her hip condition does not show a medical need for a rollator or the circumstances for which rollator use is required. (*See* ECF #9 at PageID 1764) (citing Tr. 1674). And "judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir. 1990). Accordingly, this court is not equipped to infer from the results of diagnostic imaging whether an assistive device is medically required to address the symptoms of a joint condition.

Even presuming treatment notes that frequently (but not uniformly) recount Ms. Myers used a rollator established she medically needed a rollator under SSR 96-9p, none of the treatment notes satisfy the second element by explaining the frequency, time, situation, distance, terrain, or other circumstances for when Ms. Myers needs a rollator. *See* SSR 96-9p, 1996 WL 374185, at *7. While the treatment notes do frequently (but not uniformly) document an antalgic gait and balance issues, Ms. Myers' reported and observed use of a rollator do not mean she needs a rollator for all times, situations, distances, or terrains. *See Peters v. Comm'r of Soc. Sec.*, No. 1:24-cv-26, 2024

WL 4945007, at *10 (N.D. Ohio Dec. 3, 2024) ("The notation of a balance problem does not specify when, where, or in what terrain the walker is considered to be necessary."), *report and recommendation adopted,* 2025 WL 885682 (N.D. Ohio Mar. 21, 2025). That the record is not entirely consistent about Ms. Myers' use of a rollator also prevents the court from making that inference. In this situation, "multiple courts throughout this Circuit upheld ALJ decisions that did not include the need for an assistive device in a claimant's RFC." *Cantu v. Comm'r of Soc. Sec.*, No. 3:20-cv-819, 2021 WL 2156395, at *17 (N.D. Ohio May 27, 2021) (collecting cases). Thus, even if the medical documentation established she needed a rollator, the record does not establish the required circumstances for that need. Because both are required under SSR 96-9p for an assistive device to be considered medically required and must be included in the RFC, Ms. Myers has not established her rollator was medically required.

I thus decline to order remand under Sentence Four of 42 U.S.C. § 405(g).

## CONCLUSION

After review of the record, the parties' arguments, and the law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: September 22, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE